**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NORTHSTAR FINANCIAL ADVISORS,
INC.,

        *Plaintiff-Appellee,*

v.

SCHWAB INVESTMENTS; CHARLES
SCHWAB INVESTMENT MANAGEMENT,
INC.,

        *Defendants-Appellants.*

No. 09-16347

D.C. No.
3:08-cv-04119-SI

OPINION

Appeal from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Argued and Submitted
April 12, 2010—San Francisco, California

Filed August 12, 2010

Before: Mary M. Schroeder and N. Randy Smith, Circuit
Judges, and James Maxwell Moody, District Judge.*

Opinion by Judge Schroeder

---

*The Honorable James Maxwell Moody, Senior United States District
Judge for the District of Arkansas, sitting by designation.

11405

## COUNSEL

Marc J. Gross, Roseland, New Jersey, for plaintiff-appellee Northstar Financial Advisors, Inc.

Darryl P. Rains, Palo Alto, California, for defendants-appellants Schwab Investments, et al.

## OPINION

SCHROEDER, Circuit Judge:

The issue we must decide in this appeal is whether there is a private cause of action to enforce the provisions of § 13(a) of the Investment Company Act of 1940 ("ICA" or "1940 Act"), 15 U.S.C. § 80a-13(a). That section generally requires an investment company to obtain shareholder approval before deviating from the investment policies contained in the company's registration statement filed with the Securities and Exchange Commission ("SEC").

Our circuit has not decided the issue, but the Second Circuit has held that there is no private right to enforce five other

sections of the ICA, reasoning in relevant part that the purpose and structure of the entire Act is grounded upon enforcement by the SEC, not on private enforcement. *See Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007) (per curiam); *Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429, 433 (2d Cir. 2002). The district court, however, held in a published opinion that Congress did intend private enforcement of § 13(a), citing language in the Sudan Accountability and Divestment Act of 2007 ("SADA"), Pub. L. No. 110-174, 121 Stat. 2516 (2007), that bars suits against investment companies and their advisors for divesting from companies that do business in Sudan. *Northstar Fin. Advisors, Inc. v. Schwab Inv.*, 609 F. Supp. 2d 938, 944-45 (N.D. Cal. 2009). The district court then certified its decision for interlocutory appeal.

We now reverse and hold that nothing in § 13(a) as originally enacted or as subsequently amended either creates a private cause of action or recognizes one exists with the clarity and specificity required under Supreme Court precedent. We are unable to agree with the district court that the SADA's bar to particular litigation on account of the Sudanese emergency is sufficient to constitute recognition of a preexisting private right of enforcement that is not otherwise evident in the language or structure of the ICA.

We explain our conclusion by first tracing the statutory background of the ICA, then discussing the impetus for the legislation, and finally analyzing the issues as required under Supreme Court law. We conclude that the Court has come to require increasingly specific congressional direction for the allowance of private suits to enforce public laws, and no such direction is present in this statute.

## STATUTORY BACKGROUND

### I.   The Original Act

Congress enacted the ICA in 1940 to provide comprehensive regulation of investment companies and the mutual fund

industry. *See* H.R. Rep. No. 76-2639, at 5 (1940); S. Rep. No. 76-1775, at 1 (1940). The ICA was the outgrowth of an extensive study and investigation of investment trusts and investment companies conducted by the SEC in the late 1930s. *See* S. Rep. No. 76-1775, at 1. Widespread fraud and mismanagement in the mutual fund industry had caused shareholder losses of more than $1 billion that decade. *See* H. Norman Knickle, *The Investment Company Act of 1940: SEC Enforcement and Private Actions*, 23 Ann. Rev. Banking & Fin. L. 777, 780-81 (2004). Accordingly, Congress sought to "address problems including self-dealing and breaches of fiduciary duties by fund managers, directors, and affiliates, misappropriation of fund assets, and misrepresentations to investors" that had plagued the mutual fund industry. *Id.* at 781 (footnotes omitted); *see also* 15 U.S.C. § 80a-1(b).

The ICA was the counterpart in the area of mutual fund regulation to the Securities Act of 1933 and the Securities Exchange Act of 1934 (collectively, "the 1933 and 1934 Acts"), which were designed to regulate corporate securities. Like the 1933 and 1934 Acts, the ICA requires registration with the SEC and imposes specific reporting requirements. *See* 15 U.S.C. §§ 80a-8, 80a-29. Section 8 of the ICA states that once an investment company registers with the SEC, it must file a registration statement that contains a recital of certain types of investment policies adopted by the company, including the company's policy with respect to concentration of investments in a particular industry or group of industries; any policy that is only changeable through a shareholder vote; and any policy the company deems "fundamental." 15 U.S.C. § 80a-8(b). Section 30 of the ICA states that investment companies must file annual reports with the SEC, and that they must transmit financial reports to shareholders on at least a semi-annual basis. 15 U.S.C. § 80a-29(a), (e).

The ICA, however, created a broader regulatory framework for investment companies than the 1933 and 1934 Acts created for corporate securities. *See* 6 Thomas Lee Hazen, *Trea-*

*tise on the Law of Securities Regulation* § 20.6 (6th ed. 2009). As one commentator has observed, "a significant focus of the [ICA] is corporate governance and other substantive requirements for investment companies and affiliated entities," which "is in stark comparison to Congress's focus on registration and disclosure" in the 1933 and 1934 Acts. Knickle, *supra*, 23 Ann. Rev. Banking & Fin. L. at 781. This is reflected in the legislative history, where the Senate Report stated that the 1933 and 1934 Acts "ha[d] been ineffective to correct abuses and deficiencies in investment companies." S. Rep. No. 76-1775, at 11. As one means of correcting these abuses and deficiencies, § 13 of the ICA prohibits investment companies from changing certain investment policies included in their registration statements without first obtaining shareholder approval. Subsection (a) states:

(a)  No registered investment company shall, unless authorized by the vote of a majority of its outstanding voting securities—

   (1)  change its subclassification as defined in section 80a-5(a)(1) and (2) of this title or its subclassification from a diversified to a non-diversified company;

   (2)  borrow money, issue senior securities, underwrite securities issued by other persons, purchase or sell real estate or commodities or make loans to other persons, except in each case in accordance with the recitals of policy contained in its registration statement in respect thereto;

   (3)  deviate from its policy in respect of concentration of investments in any particular industry or group of indus-

tries as recited in its registration state-ment, deviate from any investment policy which is changeable only if authorized by shareholder vote, or deviate from any policy recited in its registration statement pursuant to section 80a-8(b)(3) of this title; or

(4) change the nature of its business so as to cease to be an investment company.

15 U.S.C. § 80a-13(a).

To ensure compliance with the requirements of the ICA, Congress gave the SEC broad authority to police violations of the Act. Section 42(a) of the ICA states that the SEC

may make such investigations as it deems necessary to determine whether any person has violated or is about to violate any provision of [the ICA] or of any rule, regulation, or order hereunder, or to determine whether any action in any court or any proceeding before the [SEC] shall be instituted under [the ICA] against a particular person or persons, or with respect to a particular transaction or transactions.

15 U.S.C. § 80a-41(a). Section 42(d) and (e) authorize the SEC to initiate actions in federal court for injunctive relief or civil penalties against any person or entity the Commission suspects of violating the ICA. *See* 15 U.S.C. § 80a-41(d)-(e). Additionally, Congress granted the SEC discretion to make exemptions consistent with public interest and policy. Section 6(c) of the ICA states that the Commission

may conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of [the ICA] or of any

rule or regulation thereunder, if and to the extent that such exemption is necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of [the ICA].

15 U.S.C. § 80a-6(c).

Only one section of the ICA as originally enacted authorized anyone other than the SEC to sue for violations of the Act. Section 30(f) of the 1940 Act incorporated a remedy under the 1934 Act. The section subjected officers, directors, advisory board members, investment advisors, and affiliates of closed-end investment companies, as well as all beneficial owners of ten percent or more of the company's securities, to "the same duties and liabilities as those imposed by section 16 of the Securities Exchange Act of 1934 upon certain beneficial owners, directors, and officers in respect of their transactions in certain equity securities." Pub. L. No. 76-768, § 30(f), 54 Stat. 789, 837 (1940) (now codified at 15 U.S.C. § 80a-29(h)). Section 16(b) of the 1934 Act states that those individuals subject to its requirements may be sued "at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer" to recover short-swing profits realized by a regulated individual. 15 U.S.C. § 78 p(b). The Supreme Court has said that by incorporating the provisions of § 16(b) of the 1934 Act into § 30(f) of the ICA, Congress expressly authorized private suits for damages against closed-end investment company insiders who make short-swing profits. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 20 & n.10 (1979). There was no other authorization for private suits in the original Act of 1940.

## II.   1970 Amendments

Congress did not make any major amendments to the ICA until 1970. *See* Investment Company Amendments Act of

1970, Pub. L. No. 91-547, 84 Stat. 1413 (1970). Those amendments included relatively minor changes to §§ 8 and 13. *See id.* §§ 2(b), 3(c), & 3(d), 84 Stat. at 1414, 1415. The original § 8(b)(2) of the ICA required an investment company's registration statement to contain a recital of all investment policies "which the registrant deems matters of fundamental policy." Pub. L. No. 76-768, § 8(b)(2), 54 Stat. at 804 (now codified as amended at 15 U.S.C. § 80a-8(b)(3)). The 1970 amendments added the requirement that a company's registration statement also contain a recital of all investment polices "which are changeable only if authorized by shareholder vote." Pub. L. No. 91-547, § 3(c)(1), 84 Stat. at 1415 (codified at 15 U.S.C. § 80a-8(b)(2)). In a corresponding amendment, Congress supplemented the language in § 13(a)(3), which originally said an investment company could not, without shareholder approval, "deviate from its policy in respect of concentration of investments in any particular industry or group of industries as recited in its registration statement, or deviate from any fundamental policy recited in its registration statement." Pub. L. No. 76-768, § 13(a)(3), 54 Stat. at 811. The 1970 amendment added a limitation barring an investment company from deviating, without shareholder approval, "from any investment policy which is changeable only if authorized by shareholder vote." Pub. L. No. 91-547, § 3(d), 84 Stat. at 1415 (codified at 15 U.S.C. § 80a-13(a)(3)).

Congress made these changes to §§ 8 and 13 to clarify that an investment company violates § 13(a) whenever it deviates, without shareholder approval, from an investment policy that its registration statement says is changeable only by shareholder vote, even if the registration statement does not also identify the policy as "fundamental." *See* H.R. Rep. No. 91-1382, at 19 (1970). Both Congress and the SEC agreed this amendment was necessary in light of a federal district court's ruling that an investment company must label an investment policy as "fundamental" in its registration statement before the company could be held liable under § 13(a) for deviating

from the policy, even if the company's registration statement said that the policy could not be changed without shareholder approval. *Id.* (citing *Green v. Brown*, 276 F. Supp. 753 (S.D.N.Y. 1967), *rev'd*, 398 F.2d 1006 (2d Cir. 1968)). Congress wanted to prevent any further confusion. *Id.*

The 1970 amendments to the ICA also included changes to § 36, which deals with actions for breach of fiduciary duty. Because mutual funds are usually managed by separately owned and operated investment advisors rather than by the investment companies themselves, Congress added § 36(b), which imposed an explicit fiduciary duty on a fund's investment advisor with respect to the management fees it receives. Pub. L. 91-547, § 20, 84 *Stat.* at 1429 (codified at 15 U.S.C. § 80a-35(b)); H.R. Rep. No. 91-1382, at 7; S. Rep. No. 91-184, at 5-6 (1969). Section 36(b) also authorized the security holders of a registered investment company to bring a derivative suit against the company's investment advisor and its affiliates for breach of that duty. 15 U.S.C. § 80a-35(b).

## III.    Sudan Accountability and Divestment Act of 2007

The amendments to the ICA with which we are principally concerned in this appeal came in 2007 in response to the crisis in Darfur, Sudan. That year, Congress imposed economic sanctions on two Sudanese government officials and thirty-one Sudanese companies as a result of their involvement with the genocide in Darfur. S. Rep. No. 110-213, at 2 (2007). Those sanctions barred the subject companies from doing business within the United States financial system or with United States companies, and prohibited United States citizens from doing business with the Sudanese companies. *Id.* In addition to the sanctions imposed by the federal government, several states "enacted measures restricting their agencies' economic transactions with firms that do business with, or in, Sudan." *Id.* They were joined in their efforts by "many colleges and universities, large cities, non-profit organizations, and numerous pension and mutual funds." *Id.* at 2-3.

To facilitate the efforts of state and local governments and private asset fund managers to divest from companies involved in four specific business sectors in Sudan, Congress enacted the SADA in 2007. *Id.* at 1, 4. Congress sought to allow such divestment "to reduce the financial or reputational risk associated with investments in a country subject to international sanctions." *Id.* at 1-2; *see also id.* at 6-7. With respect to private divestment, § 4 of the SADA, entitled "Safe Harbor for Changes of Investment Policies by Asset Managers," amended § 13 of the ICA by adding a new subsection (c). Pub. L. No. 110-174, § 4(a), 121 Stat 2519-20 (codified as amended at 15 U.S.C. § 80a-13(c)). Subsection (c) expressly barred any kind of civil, criminal, or administrative action against an investment company to challenge the company's divestment from the securities of companies conducting the affected business operations in Sudan. *Id.* It stated:

(c) Limitation on actions

(1) In general

*Notwithstanding any other provision of Federal or State law, no person may bring any civil, criminal, or administrative action against any registered investment company, or any employee, officer, director, or investment adviser thereof*, based solely upon the investment company divesting from, or avoiding investing in, securities issued by persons that the investment company determines, using credible information that is available to the public, conduct or have direct investments in business operations in Sudan described in section 3(d) of the Sudan Accountability and Divestment Act of 2007.

(2) Applicability

(A) Actions for breaches of fiduciary duties

Paragraph (1) does not prevent a person from bringing an action based on a breach of a fiduciary duty owed to that person with respect to a divestment or non-investment decision, other than as described in paragraph (1).

(B) Disclosures

Paragraph (1) shall not apply to a registered investment company, or any employee, officer, director, or investment adviser thereof, unless the investment company makes disclosures in accordance with regulations prescribed by the Commission.

(3) Person defined

For purposes of this subsection the term "person" includes the Federal Government and any State or political subdivision of a State.

*Id.* (emphasis added). The report from the Senate Committee on Banking, Housing, and Urban Affairs explained that the purpose of § 13(c) was to "provide[ ] a 'safe harbor' for those divestment decisions made in accordance with the [SADA]." S. Rep. No. 110-213, at 7.

In July 2010, months after this appeal was argued and more than two years after the investments that led to the filing of the complaint, Congress enacted the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("Iran Act"), Pub. L. No. 111-195, 124 Stat. 1312 (2010). As rele-

vant to this appeal, the Iran Act amended ICA § 13(c)(1) to add a safe harbor for investment companies divesting from certain investments in Iran, and rewrote § 13(c)(2)(A) to say:

> Nothing in [§ 13(c)(1)] shall be construed to create, imply, diminish, change, or affect in any way whether or not a private right of action exists under [§ 13(a)] or any other provision of [the ICA].

*Id.* §§ 203(a), 205(b)(1), 124 Stat. at 1343, 1345. Congress specified that the amendment to § 13(c)(2)(A) "shall apply as if included in the [SADA]." *Id.* § 205(b)(2), 124 Stat. at 1345. The Conference Report for the Iran Act stated that this amendment was "designed to clarify that Congress did not intend, in the [SADA], to imply the creation of a new private right of action under the [ICA]." H.R. Rep. No. 111-512, at 67 (2010).

## BACKGROUND OF THIS LITIGATION

This litigation has nothing to do with divestment from the securities of companies doing business in Sudan. Rather, it involves claims by investors that a large American investment trust operating a series of mutual funds unlawfully deviated from the investment policies set forth in its registration statement, to the detriment of the fund's shareholders and in violation of § 13(a) of the ICA.

Defendant-Appellant Schwab Investments is an investment trust organized under Massachusetts law that consists of a series of mutual funds. In 1993, Schwab Investments initiated the Schwab Long-Term Government Bond Fund. By vote of that fund's shareholders in 1997, Schwab Investments converted the fund into the Schwab Total Bond Market Fund ("Fund"), a fixed-income mutual fund that seeks to track the Lehman Brothers U.S. Aggregate Bond Index ("Lehman Index"). The Fund hired Defendant-Appellant Charles Sch-

wab Investment Management, Inc. ("Charles Schwab") as its investment advisor.

The Fund's stated investment objective is "to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investment results of [the Lehman Index] through the use of an indexing strategy." The Fund disclosed in its registration statement that this investment policy was "fundamental, which means that it may be changed only by vote of a majority of [the] Fund's shareholders." The Fund's concentration policy says that the Fund may not invest twenty-five percent or more of the Fund's total assets in any one industry or group of industries, unless necessary to track the Lehman Index.

Plaintiff-Appellee Northstar Financial Advisors, Inc. ("Northstar") is a registered investment advisory and financial planning firm that manages discretionary and non-discretionary accounts on behalf of investors and had over 200,000 shares of the Fund under its management. In August 2008, Northstar filed this shareholder class action in district court against Schwab Investments and Charles Schwab (collectively, "Schwab") for violations of ICA § 13(a). Northstar seeks to represent a class of investors who owned shares of the Fund from August 31, 2007, to the present.

Northstar's primary claim is that Schwab violated § 13(a) when it allegedly deviated from the Fund's fundamental investment policies. *Northstar*, 609 F. Supp. 2d at 940. Northstar alleges the deviations exposed the Fund and its shareholders to tens of millions of dollars in losses stemming from a sustained decline in the value of non-agency mortgage-backed securities. *Id.* Northstar's complaint also includes state law claims for breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing that are not at issue in this appeal. *Id.* at 948-50.

Schwab moved to dismiss the action for lack of standing on the part of Northstar, asserting that Northstar could not raise

claims on behalf of its clients, who are the actual shareholders of the Fund. *Id.* at 941. The district court granted this motion, but permitted Northstar to amend its complaint to reflect its standing as the assignee of a client-shareholder, and standing is not an issue in this appeal. *Id.* at 942.

Schwab also moved to dismiss for failure to state a claim under ICA § 13(a), asserting there is no private right of action to enforce that section's terms. *Id.* at 943. The district court denied this motion, holding that there is an implied private right of action under § 13(a). *Id.* at 944. The court first rejected Northstar's assertion that this court had already conclusively decided the issue in *Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000), correctly observing that this court merely assumed without deciding in that case that an implied private right of action exists under § 13(a). *Northstar*, 609 F. Supp. 2d at 943 (citing *Lapidus*, 232 F.3d at 681 n.4). The court then declined to adopt the Second Circuit's reasoning in *Olmsted* to deny a private right to enforce § 13(a), because *Olmsted* "predated" the 2007 amendment of § 13 by the SADA. *Id.* at 944. Relying on the language of subsection (c) added to § 13 by the SADA, the court held that Congress recognized a private right to enforce § 13(a) when it enacted § 13(c). *Id.* at 944-45. The court reasoned that there was no basis for Congress to bar actions based on Sudanese divestments if the statute did not authorize other private causes of action. The district court said:

> The Court finds it significant that Section 13(c) expressly limited the types of actions that a "person" could file under Section 13. If there were no private right of action under Section 13(a), there would be no need to restrict the actions that could be filed under Section 13. [Schwab] argue[s] Section 13(c) cannot be read as referring to Section 13(a) or any other specific statutory provision, and they note that there is nothing in the legislative history suggesting that Section 13(c) was meant to imply a private right

of action under Section 13(a). However, if Congress intended for Section 13(c) to operate as a stand alone "safe harbor" provision, Congress easily could have added Section 13(c) as an entirely new provision of the ICA rather than amending Section 13, or could have stated that there was no private enforcement of Section 13 whatsoever. The fact that Congress only limited certain types of actions suggests that Congress intended that there be a private right of action under Section 13(a).

*Id.* at 944-45.

Recognizing, however, that the issue of whether there is an implied private right of action to enforce § 13(a) is not free from doubt, the district court certified its decision for interlocutory appeal, which this court accepted. *See* 28 U.S.C. § 1292(b).

## ANALYSIS

We must now decide whether there is a private right to enforce § 13(a) of the ICA. This is a question of statutory construction that we review de novo. *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1229 (9th Cir. 2008). "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979)) (internal quotation marks omitted). Instead, the statute must either explicitly create a private right of action or implicitly contain one. *In re Digimarc*, 549 F.3d at 1230. Both parties in this appeal agree that § 13(a) does not expressly create a private right of action.

Accordingly, if there is any private right to enforce § 13(a), it must be implied from the statute's language, structure, context, and legislative history. *Id.*; *Opera Plaza Residential Par-*

*cel Homeowners Ass'n v. Hoang*, 376 F.3d 831, 836 (9th Cir. 2004). As the party seeking to establish a private right to enforce § 13(a), the burden rests with Northstar to demonstrate that such a private right of action exists. *Opera Plaza*, 376 F.3d at 835. For the reasons explained below, Northstar has not met this burden.

## I.   Language and Structure of the Act

Our analysis of whether § 13(a) contains an implied private right of action begins with the language and structure of the statute itself. *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001); *In re Digimarc*, 549 F.3d at 1231. This is because congressional intent to create a private right of action is the "key inquiry" in determining whether an implied private right to enforce the statute exists. *Opera Plaza,* 376 F.3d at 835; *see also Orkin v. Taylor*, 487 F.3d 734, 739 (9th Cir. 2007). In analyzing the language of § 13(a), we look for the presence of any "rights-creating language" that might imply Congress intended to confer upon shareholders the right to sue an investment company for violating the statute's requirements. *See Sandoval*, 532 U.S. at 288-89; *In re Digimarc*, 549 F.3d at 1231-32. We then look to the structure of the ICA itself. We have observed that "analogous provisions [of the statute] expressly providing for private causes of action can imply congressional intent not to create an implied cause of action." *Opera Plaza*, 376 F.3d at 836 (citing *Touche Ross*, 442 U.S. at 571-74). We also look to see whether Congress designated a method of enforcement other than through private lawsuits, because "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290.

**[1]** We turn first to whether the statute contains any language that would imply Congress intended to allow private enforcement of the statute's requirements, what in *Sandoval* is termed "rights-creating language." *Id.* at 288. Section 13(a) contains none. Instead, § 13(a) is focused on limiting the

types of actions an investment company can take without first obtaining shareholder approval. "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.' " *Id.* at 289 (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). This is because there is "far less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting [the statute] with an unmistakable focus on the benefitted class," writes it "simply as a ban on" or "as a prohibition against" undesirable conduct by a regulated entity. *Cannon*, 441 U.S. at 690-92.

**[2]** Here, as in the district court, Northstar contends that in *Lapidus* we already construed the statute as creating a private right. The district court correctly said we did not. *Northstar*, 609 F. Supp. 2d at 943. As the district court explained, we found it unnecessary in *Lapidus* to reach the question of whether § 13(a) creates an implied private right of action. *Id.* This was because the district court in *Lapidus* had dismissed the plaintiffs' § 13(a) claims for lack of subject matter jurisdiction and not for failure to state a claim. *Lapidus*, 232 F.3d at 681. We said in a footnote in *Lapidus* that the existence of a private right to enforce § 13(a) could be "assumed without being decided" to resolve the jurisdictional question before us, because "the question whether a cause of action exists is not a question of jurisdiction." *Id.* at 681 n.4 (quoting *Burks v. Lasker*, 441 U.S. 471, 476 n.5 (1979)) (internal quotation marks and citation omitted). We resolved the jurisdictional question in the plaintiffs' favor, and remanded to the district court for consideration in the first instance of the defendants' other asserted grounds for dismissal. *Id.* at 684. On remand, the district court dismissed the plaintiffs' claims for failure to state a claim without addressing whether § 13(a) creates an implied private right of action. *Lapidus v. Hecht*, 2002 WL 1034042 (N.D. Cal. May 17, 2002). The language of the statute does not imply a private remedy, and we have never held that it did.

**[3]** We next turn to the structure of the ICA to determine whether it suggests any congressional intent to allow private enforcement. Our Circuit has not done this analysis, but the Second Circuit, twice in the past decade, has analyzed the ICA's statutory scheme for evidence of congressional intent to create a private right of action to enforce other sections of the Act, and has concluded that no such evidence exists. *See Bellikoff*, 481 F.3d at 116-17 (holding there is no private right of action to enforce ICA §§ 34(b), 36(a), and 48(a)); *Olmsted*, 283 F.3d at 432-33 (holding there is no private right of action to enforce ICA §§ 26(f) and 27(i)). In both *Bellikoff* and *Olmsted*, the Second Circuit focused on the fact that § 42 of the ICA, 15 U.S.C. 80a-41, authorizes SEC enforcement of the ICA, and that Congress actually created an express private right of action against investment advisors for breach of certain fiduciary duties in § 36(b). This led the Second Circuit to conclude that Congress did not intend to imply a private right to enforce other sections of the ICA. *See Bellikoff*, 481 F.3d at 116-17; *Olmsted*, 283 F.3d at 433.

**[4]** We now agree with the Second Circuit that the structure of the ICA does not indicate that Congress intended to create an implied private right to enforce the individual provisions of the Act. In §§ 6 and 42 of the ICA, Congress expressly authorized the SEC to enforce all of the provisions of the Act by granting the Commission broad authority to investigate suspected violations; initiate actions in federal court for injunctive relief or civil penalties; and create exemptions from compliance with any ICA provision, consistent with the statutory purpose and the public interest. 15 U.S.C. §§ 80a-6(c), 80a-41. This thorough delegation of authority to the SEC to enforce the ICA strongly suggests Congress intended to preclude other methods of enforcement. *Sandoval*, 532 U.S. at 290. The Supreme Court has also cautioned that "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica*, 444 U.S. at 19. Because the statutory scheme of the ICA provides for thorough SEC enforcement of the

Act's provisions, including § 13(a), "it is highly improbable that Congress absentmindedly forgot to mention an intended private action." *Id.* at 20 (internal quotation marks and citation omitted).

**[5]** Moreover, it is evident from the text of the ICA that Congress knew how to create a private right of action to enforce a particular section of the Act when it wished to do so. In § 30(f) of the original 1940 Act (now codified at 15 U.S.C. § 80a-29(h)), Congress expressly authorized private suits for damages against insiders of closed-end investment companies who make short-swing profits. *Transamerica*, 444 U.S. at 20 & n.10. Congress created a second express private right of action in 1970 when it added § 36(b) to the ICA, which allows shareholders to sue an investment company's advisor and its affiliates for breach of certain fiduciary duties relating to management fees. 15 U.S.C. § 80a-35(b); *Bellikoff*, 481 F.3d at 116; *Olmsted*, 283 F.3d at 433. Congress's enactment of these two express private rights of action elsewhere in the ICA, without the enactment of a corresponding express private right of action to enforce § 13(a), indicates that Congress did not, by its silence, intend a private right of action to enforce § 13(a). *See In re Digimarc*, 549 F.3d at 1232-33.

Despite this strong evidence from the language of § 13(a) and the ICA's statutory scheme that Congress did not intend to create a private right of action to enforce § 13(a), Northstar argues that such a right can be implied from §§ 1, 33, and 44 of the Act. We disagree, as none of these sections demonstrate that Congress intended private enforcement of each of the provisions of the ICA.

Section 1, the congressional findings and declaration of policy, contains general language indicating that one of the purposes of the Act is to protect investors. 15 U.S.C. § 80a-1. That is a key function of the SEC. This general language does not demonstrate that Congress intended the ICA to be enforced by any entity other than the SEC. *See Sandoval*, 532

U.S. at 290; *Transamerica*, 444 U.S. at 24 ("[T]he mere fact that [a] statute was designed to protect [one class of individuals] does not require the implication of a private cause of action for damages on their behalf."); *Touche Ross*, 442 U.S. at 578 ("[G]eneralized references to the 'remedial purposes' of [an act] will not justify reading a provision 'more broadly than its language and the statutory scheme reasonably permit.' " (quoting *SEC v. Sloan*, 436 U.S. 103, 116 (1978))).

Section 33 does nothing more than require investment companies and their affiliates to file certain litigation documents with the SEC whenever an investment company or one of its affiliates is a party to a suit against an officer, director, investment advisor, trustee, or depositor of the investment company. 15 U.S.C. § 80a-32. This filing requirement does not imply that Congress anticipated private suits against investment companies for violations of the ICA; the requirement applies to "any action or claim" and is not solely directed to suits for violations of the ICA. *Id.*

Section 44 is the ICA's jurisdictional provision; it grants concurrent federal and state jurisdiction over "all suits in equity and actions at law" brought to enforce the provisions of the entire ICA. 15 U.S.C. § 80a-43. It does not create a private right of action to enforce § 13(a). The entity entitled to sue for violations must be identified in the substantive provision of the act. *See Touche Ross*, 442 U.S. at 577 ("The source of plaintiffs' rights must be found, if at all, in the substantive provisions of the [act] which they seek to enforce, not in the jurisdictional provision.").

## II.   Legislative History of Amendments to the Act

Northstar goes on to argue that even if the Act's language does not imply a private right to sue, the statute's legislative history, specifically the amendments to §§ 8 and 13 enacted in 1970 and 2007, demonstrates that Congress intended there to be an implied private right of action to enforce § 13(a). We

must disagree, because nothing in the language or context of those amendments demonstrates a clear congressional intent to allow private lawsuits to enforce the statute's provisions.

## A.    The 1970 Amendments

**[6]** Congress amended §§ 8 and 13 in 1970 to make it clear that an investment company's registration statement must recite all policies that can be changed only by shareholder vote and that deviation from any policy so designated violates § 13(a). Northstar contends that when Congress amended these two sections, it meant to affirm its original intent to create a private right of action under § 13(a). No such meaning or intent is apparent. The amendments deal with the need for shareholder votes to change investment policy. The language and legislative history reflect that purpose and that purpose only.

**[7]** The report of the House Committee on Interstate and Foreign Commerce states that the purpose of the amendments was "to make clear that deviation from an investment policy which is changeable only by shareholder vote constitutes a violation of section 13," regardless of whether the investment company's registration statement explicitly identifies the policy as "fundamental." H.R. Rep. No. 91-1382, at 19. By clarifying when a change of policy violates § 13(a), Congress did not thereby indicate an intent to recognize a private remedy for such a violation.

Northstar further contends that the 1970 amendments affirmed a contemporary federal court interpretation of § 13(a) as privately enforceable. Northstar tries to invoke the principle that when an implied cause of action is part of the "contemporary legal context" in which Congress amends a statute, and a significant amendment of the statute leaves intact the provisions the courts relied on for implying a cause of action, Congress intends the cause of action to remain. In this situation, the lack of change "is itself evidence that Con-

gress affirmatively intended to preserve that remedy." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381-82 (1982). It is only evidence, however. The Supreme Court has cautioned that "dispositive weight" should not be given to the expectations Congress has with respect to the contemporary legal context. *Sandoval*, 532 U.S. at 287-88.

Here, we can give the expectations no weight, because there was no "contemporary legal context" in 1970, when Congress amended §§ 8 and 13 recognizing a private right of action under § 13(a). Northstar cites to only two cases — both from federal district courts — to support its theory that there was such a context: *Green v. Brown*, 276 F. Supp. 753 (S.D.N.Y. 1967), and *Leighton v. The One William Street Fund, Inc.*, 1965 U.S. Dist. LEXIS 9430 (S.D.N.Y. July 2, 1965).

Even assuming two district court, and hence non-precedential, cases could provide a legal context, neither *Green* nor *Leighton* actually held that there was an implied private right to enforce § 13(a). In *Green*, a stockholder of an investment company brought a derivative action against the company and its directors, alleging the defendants violated § 13(a) of the ICA by concentrating the company's investments in a manner contrary to the investment policy contained in the company's registration statement. *See* 276 F. Supp. at 754. The district court granted the defendants' motion for summary judgment, holding that the defendants had not violated § 13(a) because the company's registration statement did not characterize the investment policy at issue as a "fundamental policy," even though the registration statement said the policy could not be changed without shareholder approval. *Id.* at 755-56. The question of whether a private right of action to enforce § 13(a) even existed was not raised by any of the parties and was not addressed in the district court's decision. The House Report and other portions of the legislative history relating to the 1970 amendments to §§ 8 and 13 indicate that Congress was, of course, aware of *Green*,

because it wanted to clarify the confusion *Green* had created about the need for shareholder votes. *See* H.R. Rep. No. 91-1382, at 19. There is no indication Congress thought the case stood for anything else. The amendments made it clear that any unapproved deviation from policies the registration statement says require a shareholder vote violate § 13(a).

The earlier district court case, *Leighton,* also involved whether shareholder approval was needed. In *Leighton*, a stockholder challenged an investment fund's decision to hire a certain investment advisor as its broker and to pay that advisor brokerage commissions. 1965 U.S. Dist. LEXIS 9430, at *6-8. The stockholder argued that decision, made without shareholder approval, amounted to a change in fundamental policy in violation of § 13(a) of the ICA. *Id.* at *6-7. The district court rejected this claim, entering summary judgment on behalf of the fund and its advisor because the fund's registration statement was silent on the matter of brokerage commissions. *Id.* at *7-8. The non-published opinion does not discuss the existence of a private right to enforce § 13(a). It held there had been no violation of § 13(a). Even if Congress had been aware of the *Leighton* decision when it amended §§ 8 and 13 in 1970, it could not have believed the amendments affirmed any recognition in *Leighton* of a private right to enforce § 13(a).

## B.  The 2007 Amendments

[8] Northstar's stronger argument, the one the district court accepted, is that Congress recognized a preexisting private right of action to enforce § 13(a) when it enacted the SADA in 2007 and added § 13(c) to the ICA. Section 13(c) is a broad prohibition of remedies for a narrow purpose. It prohibits the availability of any remedy or cause of action pertaining to an investment company's divestment from, or failure to invest in, securities of entities, but only of those that do business in the oil, power production, mineral extraction, or military equipment sectors of Sudan. *See* 15 U.S.C. § 80a-13(c)(1)(A). It is

a broad prohibition because it bars all civil, criminal, and administrative actions, including state as well as federal claims, and it begins with the sweeping phrase "[n]otwithstanding any other provision of Federal or State law." *Id.* It has narrow application because it applies to Sudanese divestments.

**[9]** Section 13(c) thus is a bar to actions any person or government agency might file to challenge divestment from Sudanese investments. The district court found it significant that § 13(c) referred to actions that a "person" could file, and that it included actions under § 13. *Northstar*, 609 F. Supp. 2d at 944. The court reasoned that "[i]f there were no private right of action under Section 13(a), there would be no need to restrict the actions that could be filed under Section 13." *Id.* Thus, the argument concludes, Congress's use of the word "person" in § 13(c) must mean that private persons, and not just the SEC, are otherwise authorized to bring an action for a violation of § 13(a).

**[10]** This argument would have some validity if the Sudanese bar in § 13(c) applied only to causes of action to enforce the other provisions of § 13, including § 13(a). But the bar is not so limited. The § 13(c) bar extends to any civil, criminal, or administrative action brought under any state or federal law. Thus, Congress included the term "person" to describe the entities restricted from bringing the types of actions barred by § 13(c), because a wide range of "persons" are potential plaintiffs when all possible civil, criminal, and administrative actions under both state and federal law are considered. Congress meant to bar all such potential plaintiffs from remedies for divestment. It did not limit the Sudanese bar to plaintiffs under § 13(a). Thus, we conclude Congress did not use the word "person" as recognition of a private right of action to enforce § 13(a).

The legislative history of the SADA supports our interpretation of the language of § 13(c) as barring actions beyond

those for violations of the provisions of § 13. According to the report of the Senate Committee on Banking, Housing, and Urban Affairs, a primary purpose of the SADA was to permit public and private asset managers to adopt Sudanese divestment measures without fear of legal reprisals. S. Rep. No. 110-213, at 1-2. To this end, § 4 of the SADA added § 13(c) to the ICA to "allow[ ] private asset managers, if they so choose, to divest from the securities of companies conducting business operations in the power production, mineral extraction, oil, and military equipment sectors of Sudan," and to "provide[ ] a 'safe harbor' for those divestment decisions made in accordance with the [SADA]." *Id.* at 6-7. Congress could not have intended to restrict § 13(c)'s application solely to causes of action arising from divestments that might otherwise violate § 13(a).

Northstar nevertheless points to the heading of § 4 of the SADA as indicating that Congress intended ICA § 13(c) to apply only to causes of action arising from violations of ICA § 13(a). Section 4 of the SADA is entitled "Safe Harbor for Changes of Investment Policies by Asset Managers." Pub. L. No. 110-174, § 4, 121 Stat. at 2519. The somewhat attenuated argument is that the reference to "investment policies by asset managers" mirrors the language in ICA § 13(a)(3), which prohibits investment companies from deviating from certain types of "investment policies" without shareholder approval. Thus, Northstar concludes that § 4 of the SADA implies that ICA § 13(c), which was added to the ICA by SADA § 4, was explicitly intended to modify ICA § 13(a).

**[11]** Assuming, arguendo, that such a meaning can be attached to the words in the title, the Supreme Court has cautioned that "the title of a statute and the heading of a section cannot limit the plain meaning of the text. For interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase." *Bhd. of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 528-29 (1947). Here, the text of ICA § 13(c) unambiguously applies to all actions that can

be brought under "any other provision of Federal or State law." 15 U.S.C. § 80a-13(c)(1). It is not limited to actions for violations of ICA § 13(a). Thus, Congress's use of the term "investment policy" both in the heading of SADA § 4 and in the text of ICA § 13(a)(3) cannot be parsed to reflect any intent to restrict § 13(c)'s application to violations of § 13(a), much less to constitute a recognition of private causes of action to challenge them.

Congress's recent amendment of ICA § 13(c)(2)(A) is in accord with our understanding of the relationship between § 13(a) and (c). This amendment expressly stated that § 13(c)(1) does not create or affect the existence of a private right of action under § 13(a). It provides: "Nothing in [§ 13(c)(1)] shall be construed to create, imply, diminish, change, or affect in any way whether or not a private right of action exists under [§ 13(a)] or any other provision of [the ICA]." 15 U.S.C. § 80a-13(c)(2)(A). The amendment undermines the district court's holding.

Northstar finally contends that when Congress enacted the SADA in 2007, it affirmed a private cause of action courts had recognized in the preceding 40 years. It contends there was by 2007 "unanimous case law confirming the private right of action."

Northstar cites fifteen cases, yet in fourteen the issue was either not squarely raised or not squarely decided. As we have already seen, this court in *Lapidus* only assumed, without deciding, that a private right of action exists under § 13(a). *See* 232 F.3d at 681 n.4. In both *Karpus v. Hyperion Capital Mgmt., Inc.*, 1996 WL 668860, at *2 (S.D.N.Y. Nov. 18, 1996), and *Potomac Capital Markets Corp. v. Prudential-Bache Corporate Dividend Fund, Inc.*, 726 F. Supp. 87, 93 n.5 (S.D.N.Y. 1989), the district court acknowledged that the issue of whether there is a private right of action to enforce § 13(a) had not been raised. Eleven of the other cases cited by Northstar contain no discussion of the issue whatsoever. *See,*

*e.g., Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 731-32 (2d Cir. 1998); *Rodney v. KPMG Peat Marwick*, 143 F.3d 1140, 1143 (8th Cir. 1998) (does not include any claim brought under § 13(a)); *Green*, 398 F.2d at 1008; *Phillips v. Morgan Stanley Dean Witter High Income Advantage Trust III*, 2002 WL 31119441, at *3-4 (S.D.N.Y. Sept. 25, 2002); *Lapidus*, 2002 WL 1034042, at *2-9; *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 180 n.7 (S.D.N.Y. 1996); *Krounder v. Am. Heritage Fund, Inc.*, 899 F. Supp. 142, 148-49 (S.D.N.Y. 1995); *Omni Fin. Corp. v. Cohen*, 1994 WL 97125, at *6-7 (S.D.N.Y. Mar. 22, 1994); *Monheit v. Carter*, 376 F. Supp. 334, 339 (S.D.N.Y. 1974); *Green*, 276 F. Supp. at 755-56; *Leighton*, 1965 U.S. Dist. LEXIS 9430, at *6-8.

The one case in which the court did have such an issue squarely before it and did hold that § 13(a) implies a private right of action was *Blatt v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 916 F. Supp. 1343 (D.N.J. 1996). The district court's decision in Blatt, however, did not rely on the text or history of § 13(a) itself. The court instead relied on § 7(d), 15 U.S.C. § 80a-7(d), and the court's conclusion that a private right of action existed to enforce that provision of the ICA. *Blatt*, 916 F. Supp. at 1348-50, 1357. Section 7(d) prohibits foreign investment companies from issuing securities in interstate commerce without first registering with the SEC. Section 7(d) is unrelated to § 13(a). We believe the approach taken in *Blatt* is in some tension with the Supreme Court's later teaching in *Sandoval,* requiring closer analysis of the particular provision in question to determine the existence of an implied private right of action. *See Sandoval*, 532 U.S. at 286-91.

Indeed, following the Supreme Court's decision in *Sandoval*, the modern trend has been for federal courts to deny the existence of implied private rights of action under the ICA, with many courts applying the analytical framework employed by the Second Circuit in *Olmsted* and *Bellikoff. See,*

*e.g., W. Inv. LLC v. DWS Global Commodities Stock Fund, Inc.*, ___ F. Supp. 2d ___, 2010 WL 1404208, *3-4 (S.D.N.Y. Apr. 5, 2010) (holding there is no implied private right of action under § 13(a)(3) of the ICA and rejecting district court's reasoning in this case in favor of the rationale relied on in *Olmsted* and *Bellikoff*); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 591-93 (S.D.N.Y. 2006) (holding there is no private right of action to enforce §§ 34(b) and 48(a) of the ICA and citing other post-*Olmsted* cases in the same district that reached the same conclusion); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 464-67 (D.N.J. 2005) (holding there is no implied private right of action to enforce §§ 34(b) and 36(a) of the ICA and citing other post-*Sandoval* and post-*Olmsted* cases reaching the same conclusion); *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1025-27 (C.D. Cal. 2005) (holding there is no implied private right of action to enforce § 36(a) of the ICA); *White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 986-88 (E.D. Wis. 2002) (holding that §§ 22 and 34(b) of the ICA do not create implied private rights of action).

In reversing the district court in this case, we follow the conclusion reached by the Second Circuit in *Olmsted* and *Bellikoff*, and supported by the weight of contemporary authority, that there is no implied private right of enforcement.

## CONCLUSION

Neither the language of § 13(a), the structure of the ICA, nor the statute's legislative history, including the addition of § 13(c), the Sudanese amendment, in 2007, reflect any congressional intent to create, or recognize a previously established, private right of action to enforce § 13(a). The job of enforcement remains exclusively with the SEC.

**[12]** The order of the district court is reversed and the matter remanded with instructions to grant Schwab's motion to dismiss Northstar's federal claims.

**REVERSED** and **REMANDED.**