**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

R. ABCARIAN; R. REYES; H. REYES; J. PETRIE,

*Plaintiffs-Appellants*,

v.

MELDON EDISES LEVINE; WILLIAM WATSON FUNDERBURK, JR.; JILL BANKS BARAD; MICHAEL F. FLEMING; CHRISTINA E. NOONAN; DAVID H. WRIGHT; MARCIE L. JAMES-KIRBY EDWARDS; JOSEPH A. BRAJEVICH; ERIC GARCETTI; GILBERT CEDILLO; PAUL KREKORIAN; BOB BLUMENFIELD; DAVID E. RYU; PAUL KORETZ; NURY MARTINEZ; FELIPE FUENTES; MARQUEECE HARRIS-DAWSON; CURREN D. PRICE; HERB J. WESSON, JR.; MIKE BONIN; MITCHELL ENGLANDER; MITCH O'FARRELL; JOSE HUIZAR; JOE BUSCAINO; MICHAEL NELSON FEUER; AND JAMES PATRICK CLARK,

*Defendants-Appellees.*

No. 19-55129

D.C. No. 2:16-cv-07106-FMO-JPR

OPINION

Appeal from the United States District Court
for the Central District of California
Fernando M. Olguin, District Judge, Presiding

Argued and Submitted October 15, 2019
Pasadena, California

Filed August 25, 2020

Before:  Kim McLane Wardlaw and Daniel P. Collins,
Circuit Judges, and Benjamin H. Settle,* District Judge.

Opinion by Judge Collins

## SUMMARY**

**Hobbs Act / RICO / Johnson Act**

The panel affirmed the district court's dismissal of an action in which customers claimed that the Los Angeles Department of Water and Power overcharged for electric power and then transferred the surplus funds to the City of Los Angeles, thereby allowing the City to receive what amounted to an unlawful tax under California law.

The panel affirmed the district court's dismissal of plaintiffs' claim under the Hobbs Act, which imposes criminal punishment for the taking of property by extortion. Agreeing with other circuits, the panel held that the Hobbs Act does not create a civil cause of action.

---

* The Honorable Benjamin H. Settle, United States District Judge for the Western District of Washington, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel affirmed the dismissal of plaintiffs' RICO claim for reasons different from those given by the district court. The panel held that municipal entities are not subject to liability under RICO when sued in their official capacities, but here the RICO claims were asserted against the defendant City and DWP officials in their personal capacities. Nonetheless, the RICO claim failed as a matter of law because it did not adequately allege a predicate act in extortion under California law or the Hobbs Act, mail and wire fraud, or obstruction of justice.

The panel affirmed the dismissal of plaintiffs' claims under 42 U.S.C. § 1983 on the ground that under the Johnson Act, the district court lacked jurisdiction over those claims because the rate-setting ordinances at issue were orders affecting rates chargeable by a public utility and were made by a rule-making body of a State political subdivision. Agreeing with the Second Circuit, the panel held that, at least where all other federal statutory claims have been dismissed, the Johnson Act does not permit a plaintiff to pursue a constitutionally based § 1983 claim challenging state or local rate orders. In addition, the DPW's rates did not interfere with interstate commerce and were made after reasonable notice and hearing, and a plain, speedy and efficient remedy could be had in the courts of California.

## COUNSEL

Marion R. Yagman (argued) and Joseph Reichmann, Yagman & Reichmann, Venice Beach, California, for Plaintiffs-Appellants.

Michael Martin Walsh (argued), Deputy City Attorney; Blithe S. Bock, Managing Assistant City Attorney; Michael

N. Feuer, City Attorney; Office of the City Attorney, Los Angeles, California; for Defendants-Appellees.

## OPINION

COLLINS, Circuit Judge:

Plaintiffs are customers of the Los Angeles Department of Water and Power ("DWP") who claim that DWP overcharged for electric power and then transferred the surplus funds to the City of Los Angeles ("City"), thereby allowing the City to receive what amounts to an unlawful tax under California law.[1] Plaintiffs brought suit in federal court, asserting claims under the Hobbs Act, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and 42 U.S.C. § 1983, as well as claims under state law. The district court dismissed Plaintiffs' federal causes of action for failure to state a claim, and it declined to retain jurisdiction over the remaining state-law claims. We affirm.

## I

In reviewing the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6), we may consider only "the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). "[W]e take all well-pleaded factual allegations in the complaint as true,

---

[1] Although Plaintiffs allege that DWP overcharged for both water and electric power, the operative complaint contains no allegations about any comparable transfers involving excess water revenues. Accordingly, the claims before us involve only electric power.

construing them 'in the light most favorable to the nonmoving party.'" *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018) (quoting *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008)). We review de novo whether these allegations "'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## A

DWP is governed by a Board of Water and Power Commissioners composed of five members who are ordinarily appointed by the Mayor with the approval of the City Council. *See* L.A. City Charter §§ 502(a), 670. Under the City Charter, the Board fixes the rates to be charged to DWP customers for electric power, "[s]ubject to approval by ordinance" of the City Council. *See id.* § 676(a); *see also id.* § 675(b)(3). Any city ordinance, including one approving DWP rates, must "be presented to the Mayor for approval and signature," and if the Mayor vetoes the ordinance, the Council may override the veto by a prescribed supermajority. *Id.* § 250(b), (c). The Charter provides that all revenues collected from the provision of electric power service shall be deposited in a "Power Revenue Fund" in the City Treasury. *Id.* § 679(b). These funds may be used only for specified purposes, such as costs of operation and maintenance, employee benefits, and business promotion. *Id.* § 679(c).

The Charter provides, however, that if there is a "surplus" in the Power Revenue Fund at the end of the City's fiscal year on June 30, then the City Council, acting by ordinance and with the consent of the Board, may direct that the surplus be transferred to the City Treasury's Reserve Fund. *Id.* § 344(a), (b); *see also id.* § 310 (City's fiscal year runs from July 1 through June 30 of the following year). The

Reserve Fund may be used for "unanticipated expenditures and revenue shortfalls in the City's General Fund," *id*. § 302(b); however, with the Mayor's consent (or a two-thirds vote), the City Council may approve a transfer of funds from the Reserve Fund to the City's General Fund, *id*. § 341. *See also id*. § 679(c)(9) (expressly authorizing transfers, under these procedures, from the Power Revenue Fund "to the City General Fund"). For purposes of a potential transfer, a "surplus" is defined as "the amount remaining in the . . . Power Revenue Fund, less outstanding demands and liabilities payable out of the fund . . . as shown by audited financial statements." *Id*. § 344(b)(1). However, if the Board concludes that such a transfer would have "a material negative impact on [DWP's] financial condition in the year in which the transfer is to be made," then the Board can approve or disapprove the proposed transfer in whole or in part. *Id*. § 344(b)(2), (3).

At the time that the district court ruled in this case, the applicable rates for DWP electric power services were set by a combination of two City ordinances, one of which had been adopted in 2008, and the other in 2016. The 2016 ordinance, in turn, completely superseded a prior 2012 ordinance. All three ordinances were adopted by the City Council, and approved by the Mayor, after a series of at least three public meetings—one before the Council's Energy and Environment Committee to consider the rates, another before the full Council to consider the rates, and a final Council meeting to formally approve the ordinance setting the rates.[2]

---

[2] We grant the City's motion to take judicial notice of the 2008 and 2016 ordinances and of the official Council File for the 2008, 2012, and 2016 ordinances. *Tollis, Inc. v. County of San Diego*, 505 F.3d 935, 938

Since at least 2010, the rates that DWP has charged its utility customers for electric power have exceed DWP's costs for providing that service, thereby yielding a surplus at the end of the fiscal year. Accordingly, each year over the same time period, the City Council, with the approval of the Board, has approved a transfer of surplus moneys from the Power Revenue Fund to the City's General Fund. The amounts transferred from the Power Revenue Fund have ranged from $254 million to $300 million.

## B

Plaintiffs R. Abcarian, R. Reyes, H. Reyes, and J. Petrie[3] are individuals who have public utility accounts with DWP for the provision of electric power. According to Plaintiffs, DWP's ability to make annual transfers from the Power Revenue Fund to the City's General Fund indicates that the electric power rates charged by DWP have consistently exceeded its reasonable costs of providing those services. Plaintiffs allege that, as a result, the above-cost utility rates constituted a "tax" within the meaning of Article XIII C of the California Constitution and are therefore subject to the voter-approval requirements established in that article. In defining what counts as a "tax" that must be approved by voters, Article XIII C broadly covers "any levy, charge, or

---

n.1 (9th Cir. 2007); *Chaker v. Crogan*, 428 F.3d 1215, 1223 n.8 (9th Cir. 2005); *Rabkin v. Dean*, 856 F. Supp. 543, 546 (N.D. Cal. 1994). We otherwise deny the motion.

[3] Neither the initial complaint nor any other document in the record sets forth the full names of the Plaintiffs. Because J. Petrie was not added as a plaintiff until the filing of the First Amended Complaint, the term "Plaintiffs," as used in this opinion, does not include Petrie when referencing procedural actions taken prior to the filing of that amended complaint.

exaction of any kind imposed by a local government," except for, *inter alia*, a "charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, *and which does not exceed the reasonable costs to the local government of providing the service* or product." *See* Cal. Const. art. XIII C, § 1(e)(2) (emphasis added). It is undisputed that the City has not submitted the relevant electric power rates to the electorate for its approval.

On September 21, 2016, Plaintiffs filed a putative class action complaint against various City and DWP officials, alleging that DWP "illegally overcharges its customers" for electric service and that the defendants were liable to rate-payers on a variety of federal and state-law grounds. Plaintiffs sought a preliminary injunction shortly thereafter, and Defendants opposed that motion and moved to dismiss or stay the action. Defendants' motion argued, among other grounds, that the case should be stayed or dismissed under *Colorado River Conservation District v. United States*, 424 U.S. 800 (1976), in light of a parallel state court class action challenging the legality of the City's electric rates under Article XIII C, *see Eck v. City of Los Angeles*, No. BC577028 (L.A. Super. Ct.). On November 28, 2016, the district court stayed this case pending resolution of *Eck*, concluding that Plaintiffs' action "is essentially a dressed-up version of the *Eck* complaints." In light of the stay, the district court denied Plaintiffs' request for a preliminary injunction. Shortly thereafter, the district court denied Plaintiffs' separate motion to enjoin the *Eck* action. Plaintiff appealed these orders, and we affirmed. *See Abcarian v. Levine*, 693 F. App'x 487 (9th Cir. 2017). Our memorandum affirming the district court's orders expressed no view of the underlying merits of Plaintiffs' claims.

After the state court subsequently granted preliminary approval for a class action settlement in the *Eck* litigation, Plaintiffs successfully moved to lift the stay of this action. Plaintiffs thereafter filed the operative First Amended Complaint ("FAC") against the following 27 City officers and employees ("Defendants"): the five members of the DWP Board; three "operating head[s] of DWP"; DWP's in-house legal counsel; the fifteen members of the City Council; the Mayor; and the City Attorney and his chief deputy. The FAC asserts nine claims, three of which expressly arise under federal law.[4]

First, Plaintiffs allege that Defendants are personally liable under 42 U.S.C. § 1983 in their individual capacities, on the theory that the City's unlawful overcharges deprived Plaintiffs of property without due process of law. Second, Plaintiffs allege that Defendants are liable for these same due process violations under 42 U.S.C. § 1983 in their *official* capacities "pursuant to the principles set forth in *Monell v. Dep't of Social Services*," 436 U.S. 658 (1978). Third, Plaintiffs assert a claim under the civil action provision of RICO, 18 U.S.C. § 1964. Specifically, Plaintiffs allege that, by overcharging for electric power services and threatening to terminate service for customers who did not pay, Defendants committed multiple "civil RICO predicates, including at least fraud, wire fraud, mail fraud, extortion, and obstruction of justice."

The FAC alleged six additional claims, five of which (fraud, conspiracy, conversion, breach of contract, and interference with economic relations) rested solely on state

---

[4] The FAC actually contains two versions of these nine claims, depending upon whether or not Plaintiffs' challenges to the overcharges are found to constitute a challenge to a "rate" order for utility services.

law.  The last claim, for "extortion," was expressly "charged both as a tort, *as a violation of the Hobbs Act*, [18 U.S.C. § 1951,] and as a RICO predicate" (emphasis added).  The district court and the parties construed this claim as alleging not only a state-law tort claim and a RICO predicate but also a direct federal cause of action for a violation of the Hobbs Act.

The district court dismissed the four federal claims with prejudice and the state law claims without prejudice. Plaintiffs timely appealed.

## II

We first address Plaintiffs' assertion of a direct cause of action under the Hobbs Act, 18 U.S.C. § 1951.  That statute imposes criminal punishment on:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section . . . .

18 U.S.C. § 1951(a).  Plaintiffs contend that this criminal statute creates a private civil right of action in favor of those persons from whom property is taken by extortion, and they allege that by threatening to turn off Plaintiffs' utility services unless they paid DWP's unlawful utility rates, Defendants have obtained money from Plaintiffs by "extortion."  The district court properly dismissed this claim.

Prior to its decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court "followed a different approach to recognizing implied causes of action than it follows now." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). Under this "'*ancien regime*,' the Court assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose," and the Court routinely implied causes of action "not explicit in the statutory text itself." *Id*. (citations omitted). But the Court has now clarified that, "when deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent." *Id*. at 1855–56 (quoting *Sandoval*, 532 U.S. at 286). That is, a cause of action may now be recognized under a statute only where the language Congress used "displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286. This "interpretive inquiry begins with the text and structure of the statute and ends once it has become clear that Congress did not provide a cause of action." *Id*. at 288 n.7 (citation omitted); *see also Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 615 F.3d 1106, 1115 (9th Cir. 2010). Thus, if the statutory language "*itself* does not 'display an intent' to create 'a private remedy,' then 'a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.'" *Ziglar*, 137 S. Ct. at 1856 (quoting *Sandoval*, 532 U.S. at 286–87) (alteration marks omitted) (emphasis added).

Here, the text of the Hobbs Act merely defines a criminal offense and the prescribed punishment for that offense, and it contains no "'rights-creating' language" manifesting an intent to create an accompanying civil private right of action for victims of extortion (or anyone else, for that matter). *Sandoval*, 532 U.S. at 288 (citing *Cannon v. University of*

*Chicago*, 441 U.S. 677, 690 n.13 (1979)).  Indeed, even prior to *Sandoval*, the Supreme Court noted that it "has rarely implied a private right of action under a criminal statute, and where it has done so 'there was at least a statutory basis for inferring that a civil cause of action of *some* sort lay in favor of *someone*.'"  *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979) (quoting *Cort v. Ash*, 422 U.S. 66, 79 (1975)) (emphasis added).

Plaintiffs nonetheless argue that, as alleged victims of Hobbs Act extortion, they are "members of the class for whose especial benefit the statute was enacted," and a cause of action in their favor should therefore be implied.  But the fact that a federal criminal statute protects victims of the offense defined by that statute does not, without more, make such victims the sort of "'*especial*' beneficiary" who may assert an implied private civil cause of action.  *Logan v. U.S. Bank N.A.*, 722 F.3d 1163, 1171 (9th Cir. 2013) (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)).  As we explained in *Logan*, if being a victim of the offense described in a criminal statute were sufficient to assert an implied cause of action, then "the victim of *any* crime would be an especial beneficiary of the criminal statute's proscription" who could then assert a civil claim.  *Id.* (emphasis added).  The Supreme Court has emphatically rejected that sweeping view, which "would work a significant shift in settled interpretive principles regarding implied causes of action."  *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994); *see also id.* at 190–91 ("There would be no logical stopping point to this line of reasoning: Every criminal statute passed for the benefit of some particular class of persons would carry with it a concomitant civil damages cause of action.").

Plaintiffs also contend that Congress's intent to allow civil actions under the Hobbs Act is confirmed by the fact that Congress expressly included violations of the Hobbs Act within the definition of "racketeering activity" for purposes of a civil RICO claim.   18 U.S.C. § 1961(1).   On the contrary, this fact *negates* any intention to create a civil cause of action directly under the Hobbs Act.   The inclusion of Hobbs Act violations as predicates for a civil RICO Act claim confirms that "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979).   Congress's failure to include any comparable language in the Hobbs Act itself "indicates a deliberate congressional choice with which the courts should not interfere." *Central Bank*, 511 U.S. at 184.

We thus agree with our sister circuits that the Hobbs Act does not support a private civil right of action, *see Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 713 (2d Cir. 2019); *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d 402, 408–09 (8th Cir. 1999), and we affirm the dismissal of Plaintiffs' Hobbs Act claim.[5]

## III

We likewise affirm the dismissal of Plaintiffs' RICO claim, but we do so for reasons different from those given by the district court.

---

[5] Moreover, as we later explain in connection with Plaintiffs' RICO claim, Plaintiffs have failed to allege "extortion" within the meaning of the Hobbs Act. *See infra* section III(B).   Thus, even if the Hobbs Act did provide a private right of action, any claim by Plaintiffs under that statute would still fail as a matter of law.

## A

In dismissing the RICO claim, the district court relied primarily on Ninth Circuit precedent holding that municipal entities are not subject to liability under RICO. *See Pedrina v. Chun*, 97 F.3d 1296, 1300 (9th Cir. 1996); *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 404 (9th Cir. 1991). While the district court was correct in concluding that this rule would necessarily extend to a suit against municipal officers in their *official* capacities, *see Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008) ("An official capacity suit against a municipal officer is equivalent to a suit against the entity."), the rule has no application here, because Plaintiffs' RICO claims are asserted against Defendants in their *personal* capacities. The district court thought it was sufficient that the FAC relies upon actions that Defendants performed within the scope of their *official duties*, but that is wrong. In the context of § 1983 actions, for example, the Supreme Court has expressly rejected the view that a suit against state officials "in their personal capacity for actions they take in their official capacity" is equivalent to a suit against the state itself. *Hafer v. Melo*, 502 U.S. 21, 27 (1991). We see no reason why a similar distinction would not apply here.

Indeed, our rationale for concluding that civil RICO does not apply to municipal entities—that "government entities are incapable of forming a malicious intent," *see Lancaster Cmty. Hosp.*, 940 F.2d at 404—is obviously inapplicable to natural persons. In invoking this rationale with respect to RICO, *Lancaster Community Hospital* relied heavily on *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), which rejected punitive damages against municipalities under § 1983 based in part on contemporaneous

"'respectable authority' to the effect that municipal corporations 'can not, as such, do a criminal act or a willful and malicious wrong and they cannot therefore be made liable for exemplary damages.'" *City of Newport*, 453 U.S. at 261 (quoting *Hunt v. City of Boonville*, 65 Mo. 620, 624 (1877)). Importantly, however, *City of Newport* emphasized that this rationale did *not* apply to personal-capacity suits against municipal officials and that "juries and courts" are allowed "to assess punitive damages in appropriate circumstances against the offending official, based on his personal financial resources." *Id.* at 269. The express distinction drawn by *City of Newport* further confirms that our rule *categorically* exempting municipalities from civil RICO liability does not extend to personal-capacity suits against municipal officials acting in their official capacities. The district court erred in concluding otherwise.

## B

Although we thus agree with Plaintiffs that the district court's rationale was legally flawed, we nonetheless conclude that the RICO claim was properly dismissed. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998) ("If support exists in the record, the dismissal may be affirmed on any proper ground, even if the district court did not reach the issue or relied on different grounds or reasoning."). In our view, Plaintiffs' RICO claim fails as a matter of law because it does not adequately allege a cognizable predicate act.

To state a civil RICO claim under 18 U.S.C. § 1964(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to the plaintiff's 'business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (citations omitted). Plaintiffs' FAC relies on four

specific crimes that fall within the definition of "racketeering activity," namely, extortion under California law, *see* 18 U.S.C. § 1961(1)(A); extortion under the Hobbs Act, *id*. § 1961(1)(B) (citing 18 U.S.C. § 1951); mail fraud and wire fraud, *id*. (citing 18 U.S.C. §§ 1341, 1343); and obstruction of justice, *id*. (citing 18 U.S.C. § 1503). The latter two can be readily dismissed. Plaintiffs' allegations of mail and wire fraud rest on the theory that Defendants caused DWP to send electric bills that falsely implied that the charges were consistent with California law. But especially given the open and public process by which the electric rates were set and the later transfers were made, Plaintiffs cannot repackage the underlying legal dispute under Article XIII C of the California Constitution as mail fraud or wire fraud. *See Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 620–22 (9th Cir. 2004). As for obstruction of justice, the FAC contains only a conclusory assertion devoid of factual enhancement, which is plainly inadequate. *Iqbal*, 556 U.S. at 678.

Plaintiffs' remaining theory—that Defendants' collection of unlawfully high charges for DWP electric service amounted to extortion under the Hobbs Act or California law—fails as a matter of law under *Wilkie v. Robbins*, 551 U.S. 537 (2007). In *Wilkie*, the Supreme Court held that the Hobbs Act incorporates "the common law conception of 'extortion,'" which drew a sharp "line between public and private beneficiaries" in defining what counts as "extortion." *Id*. at 563–64. Because extortion at common law "focused on the harm of public corruption, by the sale of public favors for private gain," and "not on the harm caused by overzealous efforts to obtain property on behalf of the Government," *id*. at 564, the Court rejected the plaintiff's effort in that case to assert extortion-based civil RICO claims against government officials who aggressively

sought to obtain an easement for the government from the plaintiff, *id*. at 541, 567. Plaintiffs' RICO claim here likewise rests on the theory that Defendants wrongfully sought to obtain money *for DWP and the City* from DWP customers, and it therefore fails as a matter of law under *Wilkie*.

Plaintiffs' three arguments for evading *Wilkie* all fail. First, Plaintiffs' theory that Defendants' ordinary municipal compensation supplies the necessary private gain would apply to *any* government official (who is likewise paid by the government for which he or she acts) and would simply obliterate *Wilkie*'s clear "line between public and private beneficiaries." 551 U.S. at 564. Second, Plaintiffs argue that, because *Wilkie* involved federal officials and the federal government, its holding does not apply to extortion-based civil RICO claims against *state and local* officials. This ignores the Court's reasoning in *Wilkie*, which was based on the widely accepted common-law understanding of extortion by officials *generally*, and not merely by *federal* officials. *Id*. at 564–67. Third, Plaintiffs are wrong in contending that *Wilkie* does not preclude their reliance on California-law extortion; on the contrary, *Wilkie* rejected a similar effort to invoke a Wyoming-law predicate in that case. *Id*. at 567. As the Court explained, even if the conduct in question is a crime punishable by more than one year in prison under state law, it cannot serve as a RICO extortion predicate unless it satisfies the generic *federal* definition of extortion. *Id*. (citing *Scheidler v. National Org. for Women, Inc.*, 537 U.S. 393, 409–10 (2003)). Here, as in *Wilkie*, "the conduct alleged does not fit the traditional definition of extortion, so [Plaintiffs'] RICO claim does not survive on a theory of state-law derivation." *Id*.

## IV

We also agree with the dismissal of Plaintiffs' § 1983 claims, but our reasoning again differs from the district court's. *See Steckman*, 143 F.3d at 1295. The district court held that these claims failed as a matter of law on their merits, but we do not reach that issue because we conclude that, under the Johnson Act, 28 U.S.C. § 1342, the court lacked jurisdiction over these claims.[6]

The Johnson Act provides, in full:

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
>
>> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

---

[6] We reject Plaintiffs' contention that, having lost on this jurisdictional issue below and not having filed a cross-appeal, Defendants cannot raise the Johnson Act in this court. Because that Act goes to the subject matter jurisdiction of the court, *see US West, Inc. v. Nelson*, 146 F.3d 718, 721–22 (9th Cir. 1998), it can be raised at any stage of the case, and we have an independent obligation to consider it, *see Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). We review this issue de novo, considering not just the complaint, but also the evidence submitted by the parties in connection with the motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *See US West*, 146 F.3d at 721, 724.

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342.  Even if Plaintiffs are correct that the three rate-setting ordinances at issue here violate the California Constitution, those ordinances on their face are still "order[s] affecting rates chargeable by a public utility" and they were "made by . . . a rate-making body of a State political subdivision." *Id.*[7]  And although the text of the Johnson Act mentions only injunctive relief, we have broadly construed the statute as "preclud[ing] federal court jurisdiction over all suits affecting state-approved utility rates, including actions seeking declaratory relief and compensatory damages." *Brooks v. Sulphur Springs Valley Elec. Coop.*, 951 F.2d 1050, 1054 (9th Cir. 1991); *see also Miller v. N.Y. State Pub. Serv. Comm'n*, 807 F.2d 28, 33 (2d Cir. 1986); *Tennyson v. Gas Serv. Co.*, 506 F.2d 1135, 1139 (10th Cir. 1974). Accordingly, the Johnson Act deprived the district court of subject matter jurisdiction if each of these four conditions is

---

[7] Plaintiffs argued below that this aspect of the Johnson Act was not satisfied here, because they assertedly challenge only the *transfer* of the surplus funds and not the underlying ordinances setting the electric rates. This argument cannot be squared with Plaintiffs' theory as to the underlying illegality of Defendants' actions, which is that the "charge[s] *imposed*" for electric service "exceed the reasonable costs to the local government of providing the service." CAL. CONST. art. XIII C, § 1(e)(2) (emphasis added).

satisfied here.   We hold that they are with respect to Plaintiffs' remaining § 1983 claims.

## A

In light of the dismissal of all of Plaintiffs' federal statutory claims, *see supra* sections II and III, we conclude that jurisdiction here "is based solely on . . . repugnance of the order[s] to the Federal Constitution."   28 U.S.C. § 1342(1).

As an initial matter, there is no question that Plaintiffs' § 1983 claims rest solely on the assertion that Defendants have deprived Plaintiffs of property without due process of law in violation of the Fourteenth Amendment.  *See US West*, 146 F.3d at 723 & n.4 (holding that a § 1983 action resting solely on constitutional violations satisfies § 1342(1)).   Although Plaintiffs' § 1983 claims are thus "based solely on . . . repugnance of the order[s] to the Federal Constitution," 28 U.S.C. § 1342(1), the district court nonetheless held that the Johnson Act did not apply because, in light of the two other federal statutory claims asserted in the FAC, jurisdiction over the *action* did not rest "solely" on repugnance to the federal Constitution.  In so concluding, the district court erred.

In barring federal courts from exercising "[j]urisdiction" *to interfere with state rate orders* in specified circumstances, the text of the Johnson Act necessarily focuses on the jurisdictional basis on which the court is asked to *grant* such relief.  The happenstance that there may or may not be other claims in the *case* is irrelevant—especially given the fact that, in light of the generous rules governing joinder of claims, the additional claims asserted in the action may have nothing to do with state rate orders at all.  *See* Fed. R. Civ. P. 18; *id.* advisory committee's note to 1937 adoption

(noting that Rule 18 was "patterned upon [former] Equity Rule 26"). Indeed, the Johnson Act would be a nullity if it could be evaded through the simple artifice of adding *some* other federal claim to the complaint.

But even if the inquiry under the Johnson Act focuses on the bases for asserting jurisdiction to grant relief concerning the rate orders and not on the complaint as a whole, the fact remains that, alongside their constitutionally-based § 1983 claims, Plaintiffs here *did* assert federal *statutory* claims as a basis for challenging the rates collected by DWP—namely, their Hobbs Act and RICO claims. Although these latter claims fail on their merits, jurisdiction over them is not barred by the Johnson Act, which "does not apply to claims based upon a congressional statute or federal administrative rulings, even though these commands are ultimately backed up by the Supremacy Clause (and are therefore arguably 'constitutional' claims)." *Public Serv. Co. of N.H. v. Patch*, 167 F.3d 15, 25 (1st Cir. 1998); *see also International Bhd. of Elec. Workers v. Public Serv. Comm'n* (*IBEW*), 614 F.2d 206, 209–11 (9th Cir. 1980) (same). Had those federal statutory claims survived, we would then have to confront the question whether the Johnson Act should be applied on a claim-by-claim basis, such that Plaintiffs' challenge to the rates could proceed with respect to those statutory claims but not with respect to the constitutional claims asserted under § 1983. *Cf. Patch*, 167 F.3d at 25 (declining to decide whether "the statute permits relief based on constitutional claims, even though other claims may support jurisdiction"). As explained above, however, those statutory claims have *not* survived. As the case is now configured, the *sole* remaining federal basis for challenging the rate orders is the asserted "repugnance of the order[s] to the Federal Constitution." 28 U.S.C. § 1342(1). Were the district court *now* to exercise jurisdiction to enjoin or otherwise interfere

with the rate orders, it would be doing precisely what the
Johnson Act forbids it to do. *See IBEW*, 614 F.2d at 211
(stating that the purpose of the Johnson Act was to stop
federal courts from interfering in state rate challenges,
"'usually on substantive due process grounds'" (quoting
*Swift & Co. v. Wickham*, 382 U.S. 111, 127 (1965))).

Accordingly, we agree with the Second Circuit that, at
least where all other federal statutory claims have been
dismissed, the Johnson Act does not permit a plaintiff to
pursue a constitutionally based § 1983 claim challenging
state or local rate orders. *See Evans v. N.Y. State Pub. Serv.
Comm'n*, 287 F.3d 43, 46–47 (2d Cir. 2002);**[8]** *cf. Hill v.
Kansas Gas Serv. Co.*, 323 F.3d 858, 868–69 (10th Cir.
2003) (dismissing remaining § 1983 claim on Johnson Act
grounds after dismissing all other federal claims as "wholly
insubstantial and frivolous" (citation and internal quotation
marks omitted)).

We disagree with the district court's suggestion that this
approach to the Johnson Act would contravene our
observation that "[w]e have construed the term 'solely' in
§ 1342(1) narrowly." *Hawaiian Tel. Co. v. Public Utils.
Comm'n*, 827 F.2d 1264, 1273 (9th Cir. 1987) (citing *IBEW*,
614 F.2d at 210–11). In *Hawaiian Telephone* and *IBEW*, the
defendants sought to bar a federal *statutory* challenge to state
rates in federal court on the theory that, because the statute's

---

**[8]** Because the Second Circuit's opinion in *Evans* affirmed the
Johnson-Act-based dismissal of the § 1983 claims *before* affirming the
dismissal of the remaining claims on the merits, *see* 287 F.3d at 46–47,
it is arguable that *Evans* implicitly endorsed the claim-by-claim approach
to the Johnson Act—*i.e.*, that a constitutional challenge to rates may not
go forward in federal court even if there are other *meritorious* federal
claims. But the Second Circuit ultimately was not presented with the
latter scenario, and any such implicit view would at best be dicta.

preemptive effect ultimately rested on the Supremacy Clause, the claim was actually a *constitutional* one for purposes of § 1342(1). *Hawaiian Tel.*, 827 F.2d at 1273; *IBEW*, 614 F.2d at 210–11. We concluded that any such implicit constitutional underpinning did not detract from the fundamentally statutory nature of the challenge and therefore that the challenge was not based "solely" on repugnance to the federal Constitution. *See IBEW*, 614 F.2d at 210–11; *see also Hawaiian Tel.*, 827 F.2d at 1273. Because these decisions addressed only the proper jurisdictional characterization of a federal *statutory* claim, they had no occasion to address the question whether an indisputably *constitutional* claim may go forward even when it is the "sole" claim remaining in the case. Even under a narrow construction of "solely," the solitary federal claim remaining in this case is "based solely on . . . repugnance of the order[s] to the Federal Constitution." 28 U.S.C. § 1342(1). *See US West*, 146 F.3d at 723 & n.4.

**B**

The remaining three enumerated requirements under the Johnson Act are all likewise satisfied here.

Although the DWP's rates for electrical service to its customers may have an *effect* on interstate commerce, we have held that "it is not enough that an intrastate rate-making policy merely 'affect[s]' interstate commerce." *US West*, 146 F.3d at 724. Rather, the Johnson Act bars jurisdiction unless the challenged orders "*interfere* with interstate commerce." 28 U.S.C. § 1342(2) (emphasis added). Defendants presented evidence confirming that the rates here are all for *intrastate* service, and as a general matter, such state or local "orders setting intrastate [utility] rates do not interfere with interstate commerce." *US West*, 146 F.3d at 724. In *US West*, we placed the burden on the plaintiffs to

rebut this general presumption that intrastate rate orders do not interfere with interstate commerce, and we found that the plaintiffs there failed to carry that burden. *Id*. Plaintiffs here relied below on evidence showing that DWP obtains electricity from out of state and that higher electric rates lead to "out-of-state tourists" being "charged higher prices by the businesses they patronize," but these considerations merely establish an *effect* on interstate commerce, not interference. Consequently, the Johnson Act's requirement that the orders must not interfere with interstate commerce is satisfied here.

The official records of the City Council confirm that the three rate-setting ordinances at issue were indisputably "made after reasonable notice and hearing." 28 U.S.C. § 1342(3); *see supra* section I(A). Plaintiffs below made no effort to show otherwise.

Finally, we conclude that a "plain, speedy and efficient remedy may be had in the courts" of California. 28 U.S.C. § 1342(4). In *US West*, we described this element as follows:

> Succinctly put, the state remedy is "plain" as long as the remedy is not uncertain or unclear from the outset; "speedy" if it does not entail a significantly greater delay than a corresponding federal procedure; and "efficient" if the pursuit of it does not generate ineffectual activity or unnecessary expenditures of time or energy.

146 F.3d at 724–25. Given that other DWP customers have challenged the same ordinances under Article XIII C in state court through the *Eck* litigation, *see supra* section I(B), the California courts clearly provide for a plain, speedy, and

efficient remedy under these standards.  *US West*, 146 F.3d at 725.

Because all of the elements of the Johnson Act are satisfied here, the district court lacked jurisdiction over Plaintiffs' § 1983 claims.

## V

Plaintiffs have provided no basis for concluding that any of these deficiencies could be cured by an amendment of the complaint, and based upon our own thorough review of the record, we agree that amendment would be futile.  The district court therefore did not err in denying leave to amend and in dismissing Plaintiffs' federal claims with prejudice. *See Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004).

The judgment of the district court is **AFFIRMED.**